*PRELIMINARY PRINT*

VOLUME 602 U. S. PART 1

PAGES 286–338

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 13, 2024

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## VIDAL, UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE *v.* ELSTER

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 22–704.  Argued November 1, 2023—Decided June 13, 2024

Drawing on a 2016 Presidential primary debate exchange between then-candidate Donald Trump and Senator Marco Rubio, respondent Steve Elster sought to federally register the trademark "Trump too small" to use on shirts and hats.  An examiner from the Patent and Trademark Office refused registration based on the "names clause," a Lanham Act prohibition on the registration of a mark that "[c]onsists of or comprises a name . . . identifying a particular living individual except by his written consent," 15 U. S. C. §1052(c).  The Trademark Trial and Appeal Board affirmed, rejecting Elster's argument that the names clause violates his First Amendment right to free speech.  The Federal Circuit reversed.

*Held*: The Lanham Act's names clause does not violate the First Amendment.  Pp. 292–311.

  (a) When enforcing the First Amendment's prohibition against abridging freedom of speech, this Court "distinguish[es] between content-based and content-neutral regulations of speech."  *National Institute of Family and Life Advocates* v. *Becerra*, 585 U. S. 755, 766.  A content-based regulation "target[s] speech based on its communicative content," *Reed* v. *Town of Gilbert*, 576 U. S. 155, 163, and is " 'presumptively unconstitutional,' " *National Institute of Family and Life Advocates*, 585 U. S., at 766.  Viewpoint discrimination is a particularly "egregious form of content discrimination" that targets not merely a subject matter "but particular views taken by speakers on a subject."  *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829.  This Court has twice concluded that trademark restrictions that discriminate based on viewpoint violate the First Amendment.  See *Matal* v. *Tam*, 582 U. S. 218; *Iancu* v. *Brunetti*, 588 U. S. 388.

  Because the names clause does not single out a trademark "based on the specific motivating ideology or the opinion or perspective of the speaker," *Reed*, 576 U. S., at 168, it does not facially discriminate against any viewpoint.  But a law that does not facially discriminate based on

viewpoint may still be found to discriminate based on viewpoint in its practical operation. See *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 565. Elster suggests that is the case here because obtaining consent for a trademark under the names clause is easier if it flatters rather than mocks a subject. But there are many reasons why a person may wish to withhold consent to register a trademark bearing his name.

Although the names clause is not viewpoint based, it is content based because it "applies to particular speech because of the topic discussed or the idea or message expressed," *Reed*, 576 U. S., at 163—*i. e.*, it turns on whether the proposed trademark contains a person's name. Thus, the Court confronts a situation not addressed in *Tam* and *Brunetti*. Pp. 292–295.

(b) Although a content-based regulation of speech is presumptively unconstitutional, this Court has not decided whether heightened scrutiny extends to a content-based—but viewpoint-neutral—trademark restriction. Several features of trademark counsel against a *per se* rule of applying heightened scrutiny in such cases. Most importantly, trademark rights have always coexisted with the First Amendment, and the inherently content-based nature of trademark law has never been a cause for constitutional concern.

This country has recognized trademark rights since the founding. Much of early American trademark law came by way of English law, where the protection of trademarks was an inherently content-based endeavor. For most of the 18th and 19th centuries, trademark law fell largely within the "province of the States," *Tam*, 582 U. S., at 224, and went largely unrecorded. The first reported decisions in state and federal courts revolved around a trademark's content. See *Thomson* v. *Winchester*, 36 Mass. 214, 216; *Taylor* v. *Carpenter*, 23 F. Cas. 742 (No. 13,784). And as recorded trademark law began to take off in the last decades of the 19th century, its established content-based nature continued. In 1870, Congress enacted the first federal trademark law, containing prohibitions on what could be protected as a trademark. It restricted a trademark based upon its content. And as trademark disputes increased, courts continued to assess trademarks based on their content. The content-based nature of trademark law did not change when Congress enacted the Lanham Act in 1946. The Act's comprehensive system for federal registration of trademarks continues to distinguish based on a mark's content. This history demonstrates that restrictions on trademarks have always turned on a mark's content and have existed harmoniously alongside the First Amendment from the beginning. That relationship suggests that heightened scrutiny need not always apply in this unique context.

The content-based nature of trademark protection is compelled by the historical rationales of trademark law—to prohibit confusion by identifying the ownership and source of goods. Indicating ownership and the manufacturing source touch on the content of the mark, *i. e.*, from whom the product came. And policing trademarks so as to prevent confusion over the source of goods requires looking to the mark's content. Because of the uniquely content-based nature of trademark regulation and the longstanding coexistence of trademark regulation with the First Amendment, a solely content-based restriction of trademark registration need not be evaluated under heightened scrutiny. *R. A. V.* v. *St. Paul*, 505 U. S. 377, 387. Pp. 295–300.

(c) The history and tradition of restricting trademarks containing names is sufficient to conclude that the names clause is compatible with the First Amendment. Pp. 300–308.

(1) Restrictions on trademarking names have historically been grounded in the notion that a person has ownership over his own name, and that he may not be excluded from using that name by another's trademark. See *Brown Chemical Co.* v. *Meyer*, 139 U. S. 540, 544. The common law prevented a person from trademarking any name—even his own—by itself. It did, however, allow a person to obtain a trademark *containing* his own name, provided that he could not use the mark containing his name to the exclusion of a person with the same name. The common-law approach thus protected only a person's right to use his *own* name, an understanding that was carried over into federal statutory law and included in the names clause. The Court finds no evidence that the common law afforded protection to a person seeking a trademark of another living person's name. This common-law understanding is reflected in federal statutory law, and its requirement that a trademark contain more than merely a name remains largely intact. See § 1052(e)(4). It is thus unsurprising that the Lanham Act included the names clause.

The restriction on trademarking names also reflects trademark law's historical rationale of identifying the source of goods and thus ensuring that consumers know the source of a product and can evaluate it based upon the manufacturer's reputation and goodwill. Moreover, the clause respects the established connection between a trademark and its protection of the markholder's reputation. This Court has long recognized that a trademark protects the markholder's reputation, and the connection is even stronger when the mark contains a person's name.

Applying these principles, the Court has also recognized that a party has no First Amendment right to piggyback off the goodwill another entity has built in its name. See *San Francisco Arts & Athletics, Inc.*

Syllabus

v. *United States Olympic Comm.*, 483 U. S. 522, 528. By protecting a person's use of his name, the names clause "secur[es] to the producer the benefits of [his] good reputation." *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*, 469 U. S. 189, 198. Pp. 301–307.

(2) A tradition of restricting the trademarking of names has coexisted with the First Amendment, and the names clause fits within that tradition. The names clause reflects the common-law tradition by prohibiting a person from obtaining a trademark of another living person's name without consent, thereby protecting the other's reputation and goodwill. A firm grounding in traditional trademark law is sufficient to justify the content-based trademark restriction here, but a case presenting a content-based trademark restriction without a historical analogue may require a different approach. In this case, the Court sees no reason to disturb this longstanding tradition, which supports the restriction of the use of another's name in a trademark. Pp. 307–308.

(d) This decision is narrow. It does not set forth a comprehensive framework for judging whether all content-based but viewpoint-neutral trademark restrictions are constitutional. Nor does it suggest that an equivalent history and tradition is required to uphold every content-based trademark restriction. The Court holds only that history and tradition establish that the particular restriction here, the names clause in §1052(c), does not violate the First Amendment. P. 310.

26 F. 4th 1328, reversed.

THOMAS, J., announced the judgment of the Court and delivered the opinion of the Court, except as to Part III. ALITO and GORSUCH, JJ., joined that opinion in full; ROBERTS, C. J., and KAVANAUGH, J., joined all but Part III; and BARRETT, J., joined Parts I, II–A, and II–B. KAVANAUGH, J., filed an opinion concurring in part, in which ROBERTS, C. J., joined, *post*, p. 311. BARRETT, J., filed an opinion concurring in part, in which KAGAN, J., joined, in which SOTOMAYOR, J., joined as to Parts I, II, and III–B, and in which JACKSON, J., joined as to Parts I and II, *post*, p. 311. SOTOMAYOR, J., filed an opinion concurring in the judgment, in which KAGAN and JACKSON, JJ., joined, *post*, p. 325.

*Deputy Solicitor General Stewart* argued the cause for petitioner. With him on the briefs were *Solicitor General Prelogar, Principal Deputy Assistant Attorney General Boynton, Frederick Liu, Daniel Tenny, Joshua M. Salzman, Thomas W. Krause, Christina J. Hieber,* and *Mary Beth Walker.*

*Jonathan E. Taylor* argued the cause for respondent. With him on the brief were *Deepak Gupta* and *Gregory A. Beck.**

JUSTICE THOMAS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and IV, and an opinion with respect to Part III, in which JUSTICE ALITO and JUSTICE GORSUCH join.†

Steve Elster sought to register the trademark "Trump too small." But, the Patent and Trademark Office (PTO) refused to register the mark because the Lanham Act prohibits registration of a trademark that "[c]onsists of or comprises a name . . . identifying a particular living individual except by his written consent." 60 Stat. 428, 15 U. S. C. § 1052(c). Elster contends that this prohibition violates his First Amendment right to free speech. We hold that it does not.

I

A trademark is "a symbol or a device to distinguish the goods or property made or sold by the person whose mark it is, to the exclusion of use by all other persons." *Trade-Mark Cases*, 100 U. S. 82, 92 (1879); see also § 1127. As we have explained, "[t]he principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's

---

*Briefs of *amici curiae* urging reversal were filed for the International Trademark Association by *Jonathan E. Moskin* and *Jennifer L. Gregor*; for Public Citizen by *Paul Alan Levy* and *Scott L. Nelson*; and for Matthew A. Handal by *Brian A. Ross* and *Polina L. Ross.*

Briefs of *amici curiae* urging affirmance were filed for the American Intellectual Property Law Association by *James D. Crowne*; for the Foundation for Individual Rights and Expression et al. by *Christopher G. Michel*, *Todd Anten*, *Jessica A. Rose*, *J. T. Morris*, and *Ilya Shapiro*; and for Samuel F. Ernst, *pro se.*

*Susan J. Kohlmann* and *Adam G. Unikowsky* filed a brief for the Motion Picture Association, Inc., as *amicus curiae.*

†JUSTICE BARRETT joins Parts I, II–A, and II–B of this opinion.

goods from those of others." *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, 575 U. S. 138, 142 (2015). So "[o]ne who first uses a distinct mark in commerce thus acquires rights to that mark," which "include preventing others from using the mark." *Ibid.*

Trademark rights are primarily a matter of state law, but an owner can obtain important rights through federal registration. The Lanham Act creates a federal trademark-registration system administered by the PTO. Federal "[r]egistration of a mark is not mandatory," and "[t]he owner of an unregistered mark may still use it in commerce and enforce it against infringers." *Iancu* v. *Brunetti*, 588 U. S. 388, 391 (2019). Federal registration, however, "confers important legal rights and benefits." *B&B Hardware*, 575 U. S., at 142 (internal quotation marks omitted). For example, a registrant may rely on registration in litigation as prima facie evidence of his exclusive right to use the mark. §1115(a). And, registration provides nationwide constructive notice of the registrant's claim of ownership of the mark. §1072.

Only marks that meet certain criteria are federally registerable. Among other criteria, the Lanham Act contains what we will call the "names clause"—a prohibition on the registration of a mark that "[c]onsists of or comprises a name . . . identifying a particular living individual except by his written consent." §1052(c). The names clause excludes from registration "not only full names but also surnames, shortened names, and nicknames, so long as the name does in fact identify a particular living individual." 2 J. McCarthy, Trademarks and Unfair Competition §13:37, p. 311 (5th ed. 2024) (McCarthy).

Steve Elster sought to register the trademark "Trump too small," accompanied by an illustration of a hand gesture, to use on shirts and hats. The mark draws on an exchange between then-candidate Donald Trump and Senator Marco Rubio during a 2016 Presidential primary debate.

Opinion of the Court

The PTO examiner refused registration under the names clause because the mark used President Trump's name without his consent. The Trademark Trial and Appeal Board affirmed, and it also rejected Elster's argument that the names clause violates his First Amendment right to free speech.[1] The Federal Circuit reversed, holding that the names clause violated the First Amendment. *In re Elster*, 26 F. 4th 1328 (CA Fed. 2022). The court first concluded that the names clause is a viewpoint-neutral, content-based restriction on speech subject to at least intermediate scrutiny. See *id.*, at 1331, 1333–1334. It next concluded that the Government could not satisfy even intermediate scrutiny because the names clause does not advance any substantial governmental interest. See *id.*, at 1339.

We granted certiorari to resolve whether the Lanham Act's names clause violates the First Amendment. 598 U. S. —— (2023).

## II

### A

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." In general, we have held that the First Amendment prohibits the Government from restricting or burdening "expression because of its message, its ideas, its subject matter, or its content." *Ashcroft* v. *American Civil Liberties Union*, 535 U. S. 564, 573 (2002) (internal quotation marks omitted). "When enforcing this prohibition, our precedents distinguish between content-based and content-neutral regulations of speech." *National Institute of Family and Life Advocates* v. *Becerra*, 585 U. S. 755, 766 (2018). A content-based regulation "tar-

---

[1] The Board declined to reach the PTO examiner's alternative ground for refusing registration—that Elster's mark "falsely suggest[s] a connection with persons, living or dead." 15 U. S. C. § 1052(a). We focus only on the names clause and express no opinion about whether Elster's mark fails to meet other requirements for federal registration.

get[s] speech based on its communicative content," restricting discussion of a subject matter or topic. *Reed* v. *Town of Gilbert*, 576 U. S. 155, 163 (2015). "As a general matter," a content-based regulation is " 'presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests.' " *National Institute of Family and Life Advocates*, 585 U. S., at 766. Our precedents distinguish further a particularly "egregious form of content discrimination"—viewpoint discrimination. *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995). A viewpoint-based regulation targets not merely a subject matter, "but particular views taken by speakers on a subject." *Ibid.* It is also generally subject to heightened scrutiny, though viewpoint discrimination's "violation of the First Amendment is . . . more blatant." *Ibid.* Because our precedents dictate that these distinctions inform our assessment under the First Amendment, we start with them to evaluate the names clause.

In the trademark context, we have twice concluded that trademark restrictions that discriminate based on viewpoint violate the First Amendment. In *Matal* v. *Tam*, 582 U. S. 218, 223 (2017), we held that the Lanham Act's bar on disparaging trademarks violated the First Amendment. All Justices in *Tam* agreed that this bar was viewpoint based because it prohibited trademarks based only on one viewpoint: "[g]iving offense." *Id.*, at 243 (plurality opinion); see also *id.*, at 248–249 (Kennedy, J., concurring in part and concurring in judgment). And, in *Brunetti*, we held that the Lanham Act's bar on trademarks containing immoral or scandalous matter likewise violated the First Amendment. 588 U. S., at 390. We concluded that the bar was viewpoint based because it prohibited trademarks based only on one viewpoint, immoral or scandalous matter, while permitting trademarks based on other viewpoints. *Id.*, at 393–394.

The names clause does not facially discriminate against any viewpoint. No matter the message a registrant wants

to convey, the names clause prohibits marks that use another person's name without consent. It does not matter "whether the use of [the] name is flattering, critical or neutral." 2 McCarthy § 13:37.50. The Government is thus not singling out a trademark "based on the specific motivating ideology or the opinion or perspective of the speaker." *Reed*, 576 U. S., at 168 (internal quotation marks omitted); accord, *Brunetti*, 588 U. S., at 394 (explaining that a viewpoint-based trademark law "distinguishes between two opposed sets of ideas").

Elster suggests that the names clause verges on viewpoint discrimination in practice. According to Elster, it is easier to obtain consent for a trademark that flatters a person rather than mocks him. This Court has found that a law can discriminate based on viewpoint in its practical operation. See *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 565 (2011); *R. A. V.* v. *St. Paul*, 505 U. S. 377, 391 (1992). But, here, there are many reasons why a person may be unable to secure another's consent to register a trademark bearing his name. Even when the trademark's message is neutral or complimentary, a person may withhold consent to avoid any association with the goods, or to prevent his name from being exploited for another's gain.[2]

Although the names clause is not viewpoint based, it is content based. As we have explained, a restriction on speech is content based if the "law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U. S., at 163. The names clause turns on the content of the proposed trademark—whether it

---

[2] It is also hard to see the viewpoint discrimination that Elster alleges in practice. The PTO has refused registration of trademarks such as "Welcome President Biden," "I Stump for Trump," and "Obama Pajama"— all because they contained another's name without his consent, not because of the viewpoint conveyed. See PTO, Office Action of Dec. 8, 2020, Serial No. 90226753; PTO, Office Action of Oct. 15, 2015, Serial No. 86728410; *In re Hoefflin*, 97 USPQ 2d 1174, 1177–1178 (TTAB 2010).

contains a person's name.   If the trademark does contain a
person's name, and the registrant lacks that person's consent,
then the names clause prohibits registration.   Because
trademarks containing names "are treated differently from
[trademarks] conveying other types of ideas," the names
clause is content based.   *Id.*, at 164.

We thus confront a situation we did not address in *Tam*
or *Brunetti*.   In *Tam*, we were careful to "leave open" the
framework "for deciding free speech challenges to provisions
of the Lanham Act."   582 U. S., at 245, n. 17 (plurality opin-
ion); see *id.*, at 244, n. 16.   And, in *Brunetti*, we declined
to "say anything about how to evaluate viewpoint-neutral
restrictions on trademark registration."   588 U. S., at 398, n.

## B

Because we must now consider for the first time the con-
stitutionality of a content-based—but viewpoint-neutral—
trademark restriction, we begin by addressing how the na-
ture of trademark law informs the applicable constitutional
scrutiny.   Although a content-based regulation of speech
is presumptively unconstitutional as a general matter, we
have not decided whether heightened scrutiny extends to a
viewpoint-neutral trademark restriction.   Several features
of trademark counsel against a *per se* rule of applying height-
ened scrutiny to viewpoint-neutral, but content-based trade-
mark regulations.

Most importantly, trademark rights have always coexisted
with the First Amendment, despite the fact that trademark
protection necessarily requires content-based distinctions.
See generally *Tam*, 582 U. S., at 223–224; *Trade-Mark Cases*,
100 U. S., at 92.   Trademark rights "ha[ve] been long recog-
nized by the common law and the chancery courts of England
and of this country, and by the statutes of some of the
States," and that protection continues today.   *Id.*, at 92.   As
we all agree, this "[h]istory informs the understanding that
content-based distinctions are an intrinsic feature of trade-

marks." *Post*, at 330 (SOTOMAYOR, J., concurring in judgment); accord, *post*, at 312–317 (BARRETT, J., concurring in part). And, for the duration of that history, the inherently content-based nature of trademark law has never been a cause for constitutional concern.

Our country has recognized trademark rights since the founding. See B. Pattishall, The Constitutional Foundations of American Trademark Law, 78 Trademark Rep. 456, 457–459 (1988). At the outset, there were few recorded decisions, and the law developed slowly. Much of early American trademark law "was lifted essentially from that of England." *Id.*, at 457. The protection of trademarks under English law was an inherently content-based endeavor. For example, an early English law made it "lawful to and for every Trader, Dealer and Weaver of Linen Manufacture, to weave his Name, or fix some known Mark in any Piece of Linen Manufacture by him made." 13 Geo. I, c. 26, p. 458 (1726). And, a person could be liable for fraud if he sold a product under another person's mark. See, *e. g.*, *id.*, at 459; *Singleton* v. *Bolton*, 3 Dougl. 293, 99 Eng. Rep. 661 (K. B. 1783); *Southern* v. *How*, Pop. 143, 144, 79 Eng. Rep. 1243, 1244 (K. B. 1618) (mentioning that an "action did well lie" if a clothier "used the same mark" as another); J. Baker, Sources of English Legal History: Private Law to 1750, p. 675 (2d ed. 2010) (discussing *J. G.* v. *Samford*, also known as *Sandforth's Case*, which held in 1584 that an action could lie when a clothier "used another [clothier's] mark"); see also G. Jacob, A New-Law Dictionary (1729) (defining "Mark to *Goods*" as "what ascertains the Property or Goodness thereof . . . And if one Man shall use the *Mark* of another, to the Intent to do him Damage, Action upon the Case lieth"). So, the content of the mark (whether it was the same as another person's) triggered the restriction.

Although there was an early push for federal legislation to protect trademarks, no such law was enacted during our country's infancy. See B. Paster, Trademarks—Their Early

History, 59 Trademark Rep. 551, 565–566 (1969); see also F. Schechter, Historical Foundations of the Law Relating to Trade-Marks 131 (1925) (Schechter). Instead, trademark law fell largely within "the province of the States" for the 18th and most of the 19th century. *Tam*, 582 U. S., at 224. For example, Massachusetts passed a private bill incorporating a cotton corporation on the condition that it affix a label to its goods "with the seal of the said Corporation." 1 Mass. Private and Special Laws, 1789, § 5, p. 226 (1805). The law also prevented others from "us[ing] a like seal or label" by subjecting them to treble damages. *Ibid.* To be sure, for most of our first century, most commerce was local and most consumers therefore knew the source of the goods they purchased. See R. Bone, Hunting Goodwill: A History of the Concept of Goodwill in Trademark Law, 86 B. U. L. Rev. 547, 575 (2006). "[E]ven as late as 1860 the term 'trademark' really denoted only the name of the manufacturer." B. Pattishall, Two Hundred Years of American Trademark Law, 68 Trademark Rep. 121, 128 (1978). There was nonetheless "a certain amount of litigation in the state courts in the early nineteenth century," though it went unrecorded. Schechter 133.

The "first reported American decision that may be described as a trademark case" involved a dispute over the content of a mark—and in particular, the use of a person's name. Pattishall, Constitutional Foundations, at 460. In *Thomson* v. *Winchester*, 36 Mass. 214, 216 (1837), Samuel Thomson— who sold a medicine under the name "Thomsonian Medicines"—brought suit against another Massachusetts druggist who sold an allegedly inferior product under the same name. The court held that the druggist could be liable for fraud if he passed the medicine off as that of Thomson. *Ibid.*

In a similar vein, the first reported trademark case in federal court revolved around a trademark's content. Justice Story, sitting as Circuit Justice, granted an injunction to pro-

hibit a seller of spools from infringing on the plaintiff's trade-
mark of "Taylor's Persian Thread." *Taylor* v. *Carpenter*, 23
F. Cas. 742 (No. 13,784) (CC Mass. 1844). Justice Story ex-
plained that, by using the trademark, the seller "imitated . . .
both descriptions of spools and labels, red and black, of the
plaintiff's," and that the principles prohibiting such infringe-
ment were at that time "very familiar to the profession" and
not "susceptible of any judicial doubt." *Id.*, at 744.

Recorded trademark law began to take off in the last
decades of the 19th century—after the ratification of the
Fourteenth Amendment in 1868—and its established
content-based nature continued. See Schechter 134; Pattis-
hall, Two Hundred Years, at 133. American commerce be-
came more national in character, and, perhaps because of this
shift, Congress enacted the first federal trademark law in
1870. Although States retained their important role, "Con-
gress stepped in to provide a degree of national uniformity"
for trademark protection. *Tam*, 582 U. S., at 224 (citing Act
of July 8, 1870, §§ 77–84, 16 Stat. 210–212).[3]

This first law contained prohibitions on what could be pro-
tected as a trademark. For example, the law would not
protect a trademark that contained "merely the name of a
person . . . only, unaccompanied by a mark sufficient to distin-
guish it from the same name when used by other persons."
*Id.*, at 211. It thus restricted a trademark based upon its
content (*i.e.*, whether it contained more than a name). As
trademark disputes increased, courts continued to assess
trademarks based on their content. For example, this
Court's first trademark decision explained that a trademark
cannot consist of a purely geographical name, rejecting an

---

[3] This first federal trademark law "provided for the registration of trade-
marks generally without regard to whether they were used in interstate
or foreign commerce." 1 McCarthy § 5:3, at 188. This Court held that
the law exceeded Congress's power under the Commerce Clause. See
*Trade-Mark Cases*, 100 U. S. 82, 99 (1879). The law drew no challenge
under the First Amendment.

attempt by one of several coal producers in Pennsylvania's Lackawanna Valley to trademark "Lackawanna coal." *Canal Co.* v. *Clark*, 13 Wall. 311, 321 (1872). Throughout its development, trademark law has required content-based distinctions.

That did not change when Congress enacted the Lanham Act in 1946. The Act's comprehensive system for federal registration of trademarks continues to distinguish based on a mark's content. See Restatement (Third) of Unfair Competition § 9, Comment *e* (1993) (Restatement) ("The Lanham Act is generally declarative of existing law, incorporating the principal features of common law trademark protection"). The Act defines a trademark to include "any word, name, symbol, or device, or any combination thereof" that a person uses "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods." § 1127. When the Government defines what may be registered as a trademark, it necessarily decides that some words or images cannot be used in a mark. To take one example, the Lanham Act bars the registration of "a mark which so resembles [another's] mark . . . as to be likely . . . to cause confusion, or to cause mistake, or to deceive." § 1052(d). It is impossible to determine whether one trademark is the same as (or confusingly similar to) another without looking at the content of the two marks.

This history, reflected in the Lanham Act still today, demonstrates that restrictions on trademarks have always turned on a mark's content. But, despite its content-based nature, trademark law has existed alongside the First Amendment from the beginning. That longstanding, harmonious relationship suggests that heightened scrutiny need not always apply in this unique context.

The content-based nature of trademark protection is compelled by the historical rationales of trademark law. A trademark has generally served two functions: "indicating ownership of the goods to which it [is] affixed" and "indicat-

ing the source or origin of manufacture." Schechter 122. Indicating ownership of a good was needed in part to "fi[x] responsibility for defective merchandise." Restatement § 9, Comment *b.* And, indicating the source of the good helped "prospective purchasers . . . make their selections based upon the reputation, not merely of the immediate vendor, but also of the manufacturer." *Ibid.* Both goals thus reflect that trademarks developed historically to identify for consumers who sold the goods (the vendor) and who made the goods (the manufacturer). See *ibid.* In that vein, a basic function of trademark law has always been to "prohibi[t] confusion as to the source of good or services." Pattishall, Constitutional Foundations, at 458; see also *Jack Daniel's Properties, Inc.* v. *VIP Products LLC*, 599 U. S. 140, 147 (2023) ("Confusion as to source is the bête noire of trademark law"). Indicating ownership and the manufacturing source touch on the content of the mark—*i.e.*, from whom the product came. And, as we have explained, policing trademarks so as to prevent confusion over the source of goods requires looking to the mark's content. *Supra*, at 299.

Because of the uniquely content-based nature of trademark regulation and the longstanding coexistence of trademark regulation with the First Amendment, we need not evaluate a solely content-based restriction on trademark registration under heightened scrutiny. See *R. A. V.*, 505 U. S., at 387 ("Even the prohibition against content discrimination that we assert the First Amendment requires is not absolute"); *Jack Daniel's*, 599 U. S., at 159 (explaining that, in some circumstances, "trademark law [can] prevai[l] over the First Amendment" (internal quotation marks omitted)); *post*, at 330 (opinion of SOTOMAYOR, J.); *post*, at 316–317 (opinion of BARRETT, J.).

C

We have acknowledged that trademark rights and restrictions can "play well with the First Amendment." *Jack Daniel's*, 599 U. S., at 159 (internal quotation marks omit-

ted).   In this case, we do not delineate an exhaustive framework for when a content-based trademark restriction passes muster under the First Amendment.   But, in evaluating a solely content-based trademark restriction, we can consider its history and tradition, as we have done before when considering the scope of the First Amendment.   See *City of Austin* v. *Reagan Nat. Advertising of Austin, LLC*, 596 U. S. 61, 75 (2022); *id.*, at 101 (THOMAS, J., dissenting); *R. A. V.*, 505 U. S., at 382–383; *Roth* v. *United States*, 354 U. S. 476, 482–483 (1957).

The Lanham Act's names clause has deep roots in our legal tradition.   Our courts have long recognized that trademarks containing names may be restricted.   And, these name restrictions served established principles.   This history and tradition is sufficient to conclude that the names clause—a content-based, but viewpoint-neutral, trademark restriction—is compatible with the First Amendment.   We need look no further in this case.

1

Restrictions on trademarking names have a long history. See generally 2 McCarthy § 13:5.   Such restrictions have historically been grounded in the notion that a person has ownership over his own name, and that he may not be excluded from using that name by another's trademark.   As the Court has explained, "[a] man's name is his own property, and he has the same right to its use and enjoyment as he has to that of any other species of property."   *Brown Chemical Co.* v. *Meyer*, 139 U. S. 540, 544 (1891).   It is therefore "an elementary principle that every man is entitled to the use of his own name in his own business."   F. Treadway, Personal Trade-Names, 6 Yale L. J. 141, 143–144 (1897) (Treadway); see also A. Greeley, Foreign Patent and Trademark Laws § 138, p. 135 (1899) ("The right of any one to place his own name on goods sold by him is recognized as a natural right and cannot be interfered with").   "The notion that people

should be able to use their own name to identify their goods or business is deeply rooted in American mores." B. Pattishall, D. Hilliard, & J. Welch, Trademarks and Unfair Competition § 2.06 (2001).

Recognizing a person's ownership over his name, the common law restricted the trademarking of names. It prevented a person from trademarking any name—even his own—by itself. In "the early years of trademark law," courts recognized that "there can be no trade-mark in the name of a person, because . . . every person has the right to use his own name for the purposes of trade." 2 McCarthy § 13:5 (internal quotation marks omitted); see also Restatement § 14, Comment *e* ("[A]t early common law, the recognition of an unencumbered right to use one's name in trade effectively precluded the existence of trademark or trade name rights in personal names"); W. Browne, Law of Trade-Marks § 206, p. 219 (2d ed. 1885) ("The rule is, that a man cannot turn his mere name into a trade-mark"); *McLean* v. *Fleming*, 96 U. S. 245, 252 (1878) (explaining that a person cannot obtain "the exclusive use of a name, merely as such, without more").

The common law did, however, allow a person to obtain a trademark *containing* his own name—with a caveat: A person could not use a mark containing his name to the exclusion of a person with the *same* name. "A corollary of the right to use one's own name and identity in trade is the right to stop others from doing so—at least those who don't share the same name." J. Rothman, Navigating the Identity Thicket, 135 Harv. L. Rev. 1271, 1306 (2022); see also Treadway 143–144. In other words, a person's right to his name cannot be exclusive as to other people bearing the same name: John Smith cannot acquire a trademark that prohibits other John Smiths from using their own names. See *McLean*, 96 U. S., at 252 ("[H]e cannot have such a right, even in his own name, as against another person of the same name, unless such other person uses a form of stamp or label

so like that used by the complaining party as to represent that the goods of the former are of the latter's manufacture"); accord, *Brown Chemical*, 139 U. S., at 542; *Meneely* v. *Meneely*, 62 N. Y. 427, 432 (1875); see also Treadway 143; accord, *post*, at 319–320 (opinion of BARRETT, J.). Consider the case of John L. Faber and John H. Faber, two men who independently manufactured lead pencils near Nuremberg, Germany. Both men stamped the pencils they manufactured with their shared surname. After recognizing that each man "had the right to put his own name on his own pencils," the New York Supreme Court declined to allow one man to effectively trademark the other man's name. *Faber* v. *Faber*, 3 Abb. Pr. (N. S.) 115, 116 (1867).

We see no evidence that the common law afforded protection to a person seeking a trademark of another living person's name. To the contrary, English courts recognized that selling a product under another person's name could be actionable fraud. See, *e. g.*, *Singleton*, 3 Dougl. 293, 99 Eng. Rep. 661; *Croft* v. *Day*, 7 Beav. 84, 88, 49 Eng. Rep. 994, 996 (1843) ("[N]o man has a right to sell his own goods as the goods of another"). This recognition carried over to our country. See *McLean*, 96 U. S., at 252 ("[I]t is doubtless correct to say that a person may have a right in his own name as a trade-mark as against a trader or dealer of a different name"); see also *Faber*, 3 Abb. Pr. (N. S.), at 116. Even in the absence of fraud, it would be difficult, if not impossible, to square such a right to trademark another person's name with our established understanding that "[a] person may have a right in his own name as a trade-mark, as against a person of a different name." *Gilman* v. *Hunnewell*, 122 Mass. 139, 148 (1877); see also *Thaddeus Davids Co.* v. *Davids Mfg. Co.*, 233 U. S. 461, 472 (1914) (highlighting persons' "right to use their own name in trade"); *Faber*, 3 Abb. Pr. (N. S.), at 116 ("[T]he maker had the right to put his own name on his own pencils"). Relatedly, one could contract for the use of another person's name in his business. See, *e. g.*, *McLean*, 96 U. S.,

at 249 (explaining that a "physician whose name the pills bear . . . sold the right to use the same" to another); see also *L. E. Waterman Co.* v. *Modern Pen Co.*, 235 U. S. 88, 96 (1914); *Meriden Britannia Co.* v. *Parker*, 39 Conn. 450, 453 (1872) ("[T]hey made a contract with the petitioners, by which, and by subsequent contracts, the petitioners acquired the right . . . to manufacture and sell plated spoons and forks with the name 'Rogers' stamped thereon as a component part of a trade mark"). Such contracts would make little sense if one could use another living person's name in business at will. The common-law approach to trademarking names thus protected only a person's right to use his *own* name.

This common-law understanding carried over into federal statutory law. The first federal trademark law contained a requirement that a trademark contain more than merely a name. See Act of July 8, 1870, §79, 16 Stat. 211. That requirement remains largely intact. See §1052(e)(4) (prohibiting registration of a trademark if it "is primarily merely a surname"). A few decades later, federal trademark law emphasized " '[t]hat nothing herein shall prevent the registration of a trade-mark otherwise registerable because of its being the name *of the applicant*.' " Act of Feb. 18, 1911, ch. 113, 36 Stat. 918 (emphasis added). And, the Lanham Act later "incorporat[ed] the principal features of common law trademark protection," thereby "declar[ing] . . . existing law" rather than writing trademark law from scratch. Restatement §9, Comment *e*; see also W. Derenberg, Trade-Mark Protection and Unfair Trading 22 (1936) (explaining that the "function [of federal trademark law] is essentially an evidential one, reflecting the underlying common law trade-mark right with the existence of which it rises and falls"). It is thus unsurprising that the Lanham Act included the names clause, prohibiting the registration of a mark containing "a name . . . identifying a particular living individual except by his written consent." §1052(c). The names clause reflects

the common law's careful treatment of names when it comes to trademarks.

The restriction on trademarking names also reflects trademark law's historical rationale of identifying the source of goods. See *Hanover Star Milling Co.* v. *Metcalf*, 240 U. S. 403, 412 (1916) ("The primary and proper function of a trademark is to identify the origin or ownership of the article to which it is affixed"); accord, *post*, at 318 (opinion of BARRETT, J.). Trademark protection ensures that consumers know the source of a product and can thus evaluate it based upon the manufacturer's reputation and goodwill. See Restatement §9, Comment *b*; see also *Powell* v. *Birmingham Vinegar Brewery Co.*, 13 Rep. Pat. Cas. 235, 250 (Ct. App. 1896) (Lindley, L. J.) ("His mark, as used by him, has given a reputation to his goods. His trade depends greatly on such reputation. His mark sells his goods"). By barring a person from using another's name, the names clause reflects the traditional rationale of ensuring that consumers make no mistake about who is responsible for a product. See also *Hanover Star Milling Co.*, 240 U. S., at 412–413 ("The essence of the wrong [for trademark infringement] consists in the sale of the goods of one manufacturer or vendor for those of another").

Moreover, the names clause respects the established connection between a trademark and its protection of the markholder's reputation. We have long recognized that a trademark protects the markholder's reputation. See *McLean*, 96 U. S., at 254 (explaining that a trademark "enable[s a mark-holder] to secure such profits as result from his reputation for skill, industry, and fidelity"); see also *Hanover Star Milling Co.*, 240 U. S., at 412–413, 414; *Celluloid Mfg. Co.* v. *Cellonite Mfg. Co.*, 32 F. 94, 97 (CC NJ 1887) (Bradley, J.). This protection reflects that a mark may "acquir[e] value" from a person's "expenditure of labor, skill, and money." *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.*, 483 U. S. 522, 532 (1987) (internal quotation

marks omitted); accord, *McLean*, 96 U. S., at 251. Accordingly, when a person uses another's mark, "the owner is robbed of the fruits of the reputation that he had successfully labored to earn." *Amoskeag Mfg. Co.* v. *Spear & Ripley*, 2 Sandf. 599, 606 (N.Y. Super. Ct. 1849). A person's trademark is "his authentic seal," and "[i]f another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control." *Yale Elec. Corp.* v. *Robertson*, 26 F. 2d 972, 974 (CA2 1928) (Hand, J.). "This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask." *Ibid.*

This connection between a trademark and reputation is even stronger when the mark contains a person's name. "[I]s not a man's name as strong an instance of trade-mark as can be suggested?" *Ainsworth* v. *Walmsley*, 1 L. R. Eq. 518, 525 (1866). In fact, the English common law of trademarks arose from the fact that "those who sold goods . . . that were the fruit of their own labor or craftsmanship [began to] identif[y] those products . . . with their own names." Pattishall, Constitutional Foundations, at 457. As we have explained, virtually up until the Fourteenth Amendment's adoption, a trademark "really denoted only the name of the manufacturer." Pattishall, Two Hundred Years, at 128. And, this Court has long associated names with the good will they may bear. See *McLean*, 96 U. S., at 252; *L. E. Waterman Co.*, 235 U. S., at 96 ("He purported to transfer to the partnership the good will attaching to his name"). The names clause thus protects "the reputation of the named individual" by preventing another person from using his name. *Post*, at 319 (opinion of BARRETT, J.).

Applying these principles, we have recognized that a party has no First Amendment right to piggyback off the goodwill another entity has built in its name. In *San Francisco Arts & Athletics, Inc.*, the Court upheld a provision of the Amateur Sports Act of 1978 that prohibited " 'any person' "

from using the word "'Olympic'" for certain purposes
"'[w]ithout the consent'" of the U. S. Olympic Committee
(USOC), and subjected violations to "'the remedies provided
in the Lanham Act.'" 483 U. S., at 528 (quoting 36 U. S. C.
§ 380(a); alteration omitted). The Court rejected the ar-
gument that the consent requirement violated the First
Amendment because "Congress reasonably could conclude"
that the value of the word "'Olympic' was the product of the
USOC's 'own talents and energy.'" 483 U. S., at 532–533
(quoting *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433
U. S. 562, 575 (1977)). Although the petitioner certainly had
a First Amendment right to speak on political matters, it
lacked the right to "exploit the commercial magnetism" of
the word "Olympic" and the USOC's hard-won efforts in giv-
ing that word value. 483 U. S., at 539 (internal quotation
marks omitted). The names clause guards a similar inter-
est. By protecting a person's use of his name, the names
clause "secur[es] to the producer the benefits of [his] good
reputation." *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*,
469 U. S. 189, 198 (1985); see also Pattishall, Two Hundred
Years, at 121 (explaining how trademark law protects a per-
son's "commercial identity, thereby [allowing him] to enjoy
the fruits of his own labor").

2

We conclude that a tradition of restricting the trademark-
ing of names has coexisted with the First Amendment, and
the names clause fits within that tradition. Though the par-
ticulars of the doctrine have shifted over time, the consistent
through line is that a person generally had a claim only to
his own name. The names clause reflects this common-law
tradition by prohibiting a person from obtaining a trademark
of another living person's name without consent, thereby
protecting the other's reputation and goodwill.[4]

_____

[4] JUSTICE BARRETT takes a different approach, suggesting that a histor-
ical rule that mirrors the names clause is required. See *post*, at 321. But,
history-focused approaches to constitutional scrutiny do not typically re-

None of this is to say that the Government cannot innovate when it comes to trademark law. A firm grounding in traditional trademark law is sufficient to justify the content-based trademark restriction before us, but we do not opine on what may be required or sufficient in other cases. To be sure, as JUSTICE BARRETT observes, a case presenting a content-based trademark restriction without a historical analogue may require a different approach. *Post*, at 324. But, we need not develop such a comprehensive theory to address the relatively simple case before us today. See *post*, at 311 (KAVANAUGH, J., concurring in part).

We conclude that the names clause is of a piece with a common-law tradition regarding the trademarking of names. We see no reason to disturb this longstanding tradition, which supports the restriction of the use of another's name in a trademark.

## III

Our colleagues would address the names clause with two analogies. Neither is compelling in this case. Under both analogies, the test would boil down to what a judge believes is "reasonable in light of the purpose" of trademark law.

---

quire a historical twin. Cf. *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U. S. 1, 30 (2022). Nor do JUSTICE BARRETT's examples undercut the names clause's historical grounding, as they raise different aspects of trademarking names. For example, she relies upon cases that concern trademarks containing "the name of a famous person, long since dead." *Barrows* v. *Knight*, 6 R. I. 434, 438 (1860); see also *Stephano Bros., Inc.* v. *Stamatopoulos*, 238 F. 89, 93 (CA2 1916) ("In this case the name adopted is a famous Egyptian historical character, who lived at least 1,000 years before the Christian era"). The part of the names clause that we address concerns only "a particular *living* individual['s]" name. §1052(c) (emphasis added). And, her other examples concern names that had become generic or descriptive words. See *Messerole* v. *Tynberg*, 4 Abb. Pr. (N. S.) 410, 414 (N.Y. Ct. Com. Pl. 1868) (treating "the word 'Bismarck'" as "a popular term and one in general use"); *Medlar & Holmes Shoe Co.* v. *Delsarte Mfg. Co.*, 46 A. 1089, 1091 (CC NJ 1900) (treating the name of the deceased French artist Delsarte as "a generic or descriptive term").

*Post*, at 329 (opinion of Sotomayor, J.); see *post*, at 318–319
(opinion of Barrett, J.). But, no matter the approach
taken, we all agree that the names clause does not violate
the First Amendment.

Justice Sotomayor would pull "strands of precedent" to-
gether to conclude that heightened scrutiny does not apply
to trademark registration because it is a Government initia-
tive or benefit. *Post*, at 331. This conclusion rests primar-
ily upon cases in which the Government provides a cash sub-
sidy or conditions the use of a public payroll to collect union
dues. See *post*, at 331–332. But, those cases "occupy a spe-
cial area of First Amendment case law, and they are far re-
moved from the registration of trademarks." *Tam*, 582 U. S.,
at 241 (plurality opinion). The Government-benefit cases are
an ill fit for the names clause, and we would not graft this
precedent, which Justice Sotomayor acknowledges is not
controlling, onto this trademark dispute. *Post*, at 332.

Justice Barrett, echoed by Justice Sotomayor, would
import the test that we have used for a "limited public
forum." Our precedents hold that the Government "may
create a forum that is limited to use by certain groups or
dedicated solely to the discussion of certain subjects."
*Pleasant Grove City* v. *Summum*, 555 U. S. 460, 470 (2009).
Justice Barrett provides little explanation for why that
approach makes sense in the trademark context—she simply
declares that the limited public forum framework "is apt"
due to the content-based nature of trademark law. *Post*,
at 317. Although she attempts to cabin the analogy to the
content-based nature, the limited public forum test is quite
obviously about creating a *forum*. And, there is reason to
doubt that the federal trademark register is analogous to a
limited public forum. To start, unlike a speaker in a limited
public forum, a markholder does not communicate with cus-
tomers on the register. Rather, as the Government ac-
knowledges, the register "is a way of warning potential in-
fringers that they risk liability if they use the same or

confusingly similar marks." Tr. of Oral Arg. 19. The Government has also previously asserted that it did not create a forum for speech by providing for the federal registration of trademarks. See Reply Brief in *Matal* v. *Tam*, O. T. 2016, No. 15–1293, p. 4 ("[T]he government has not created a forum here"); Tr. of Oral Arg. in *Iancu* v. *Brunetti*, O. T. 2018, No. 18–302, p. 27 ("[W]e don't regard it as a limited public forum"). Without an analogous forum, it is hard to see why the test for a limited public forum should apply. We see no need to adopt a potentially fraught analogy to resolve the names clause's constitutionality.

Despite the differences in methodology, both JUSTICE SOTOMAYOR and JUSTICE BARRETT reach the same conclusion that the names clause does not violate the First Amendment. On the bottom line, there is no dispute. Rather than adopt a reasonableness test premised upon loose analogies, however, we conclude that the names clause is grounded in a historical tradition sufficient to demonstrate that it does not run afoul of the First Amendment.

IV

Our decision today is narrow. We do not set forth a comprehensive framework for judging whether all content-based but viewpoint-neutral trademark restrictions are constitutional. Nor do we suggest that an equivalent history and tradition is required to uphold every content-based trademark restriction. We hold only that history and tradition establish that the particular restriction before us, the names clause in § 1052(c), does not violate the First Amendment. Although an occasion may arise when history and tradition cannot alone answer whether a trademark restriction violates the First Amendment, that occasion is not today. In a future case, we can address the "distinct question" whether "a viewpoint-neutral, content-based trademark restriction" is constitutional without "such a historical pedigree." *Post*,

at 311 (opinion of KAVANAUGH, J.).   The judgment of the
Court of Appeals is

*Reversed.*

JUSTICE KAVANAUGH, with whom THE CHIEF JUSTICE
joins, concurring in part.

I join all but Part III of the Court's opinion.   I agree with
the Court that the names clause is constitutional, particu-
larly in light of the long history of restricting the use of
another's name in a trademark.   In my view, a viewpoint-
neutral, content-based trademark restriction might well be
constitutional even absent such a historical pedigree.   We can
address that distinct question as appropriate in a future case.
Cf., *e. g.*, *post*, at 317–319 (BARRETT, J., concurring in part).

JUSTICE BARRETT, with whom JUSTICE KAGAN joins, with
whom JUSTICE SOTOMAYOR joins as to Parts I, II, and III–
B, and with whom JUSTICE JACKSON joins as to Parts I and
II, concurring in part.

While I agree with the Court that the names clause does
not violate the First Amendment, I disagree with some of
its reasoning.   The Court claims that "history and tradition"
settle the constitutionality of the names clause, rendering
it unnecessary to adopt a standard for gauging whether a
content-based trademark registration restriction abridges
the right to free speech.   That is wrong twice over.   First,
the Court's evidence, consisting of loosely related cases from
the late-19th and early-20th centuries, does not establish a
historical analogue for the names clause.   Second, the Court
never explains why hunting for historical forebears on a
restriction-by-restriction basis is the right way to analyze
the constitutional question.   I would adopt a standard,
grounded in both trademark law and First Amendment prec-
edent, that reflects the relationship between content-based
trademark registration restrictions and free speech.   In my

view, such restrictions, whether new or old, are permissible so long as they are reasonable in light of the trademark system's purpose of facilitating source identification.

I

Content-based speech regulations are, as a general matter, "presumptively unconstitutional." *Reed* v. *Town of Gilbert*, 576 U. S. 155, 163 (2015). "The rationale of the general prohibition," we have explained, "is that content discrimination 'raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.'" *R. A. V.* v. *St. Paul*, 505 U. S. 377, 387 (1992) (quoting *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991)). But we have also recognized that in certain situations, this presumption is inapplicable, as "'there is no realistic possibility that official suppression of ideas is afoot.'" *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177, 189 (2007) (quoting *R. A. V.*, 505 U. S., at 390).

I agree with the Court that content-based trademark registration restrictions do not trigger the presumption of unconstitutionality. See *ante*, at 295. Because federal trademark law did not exist at the founding—and American trademark law did not develop in earnest until the mid-19th century—I do not take the Court to be making a claim about the original meaning of the Free Speech Clause. But, as the Court implicitly recognizes, the absence of founding-era evidence does not mean that content-based trademark registration restrictions are inherently suspect. More than a century's worth of precedent reflects that trademark law has always been content based without functioning as a ready tool of Government censorship. The First Amendment does not require us to upend this longstanding, stable system by treating trademark restrictions as "presumptively unconstitutional." *Reed*, 576 U. S., at 163.

## A

As the Court explains, trademark law existed at the founding, albeit in nascent form. *Ante*, at 296; B. Pattishall, The Constitutional Foundations of American Trademark Law, 78 Trademark Rep. 456, 457–459 (1988). From the outset, trademark protection "was an inherently content-based endeavor." *Ante*, at 296. Early English and American laws prohibited producers from placing another producer's trademark on their goods—a prohibition that depended on comparing the content of the mark with the content of the allegedly infringing use. *Ante*, at 296–297. That alone does not prove that *every* type of content-based trademark regulation should escape heightened scrutiny. More relevant is that courts and legislatures, in identifying the marks that merit legal protection, have long discriminated on the basis of content. *Ante*, at 298–299. This history, in my view, is key to understanding why we need not evaluate content-based trademark registration restrictions under heightened scrutiny.

Once trademark law got off the ground in the mid-19th century, it had an unmistakably content-based character. *Thomson* v. *Winchester*, the first reported American trademark case, involved two parties who both sold medicine under the name "'Thomsonian Medicines.'" 36 Mass. 214, 216 (1837). See E. Rogers, Some Historical Matter Concerning Trade-Marks, 9 Mich. L. Rev. 29, 42 (1910). The Court cites this case as reflective of the content-based nature of trademark protection. *Ante*, at 297. True, *Thomson* explained that the defendant could be liable if he had sold his goods under the plaintiff's name as an attempted fraud. 36 Mass., at 216. But the court explained that the result would be different if the defendant "call[ed his goods] Thomsonian as a generic term designating their general character." *Ibid.* That was because Thomson, the plaintiff, could not claim an exclusive right to use the name "if [the] term had

acquired a generic meaning, descriptive of a general kind, quality and class of medicines." *Ibid.* In other words, whether a word or phrase could qualify for trademark protection depended on "its communicative content." *Reed*, 576 U. S., at 163.

Roughly 10 years later, the New York Superior Court further developed this content-based principle in *Amoskeag Mfg. Co.* v. *Spear & Ripley*, 2 Sandf. 599 (1849), long " 'regarded as the leading American adjudication' " of a trademark dispute. B. Pattishall, Two Hundred Years of American Trademark Law, 68 Trademark Rep. 121, 125 (1978). The court agreed that "[e]very manufacturer . . . has an unquestionable right to distinguish the goods that he manufactures or sells, by a peculiar mark or device, in order that they may be known as his." *Amoskeag*, 2 Sandf., at 605. But the law will only "protec[t him] in the exclusive use" of marks that "designat[e] the true origin or ownership"—*i.e.*, the source—of the goods. *Id.*, at 606. The manufacturer cannot claim a protectable trademark in "words, letters, figures or symbols" that indicate only the "name or quality"—*i.e.*, not the source—of the goods. *Ibid.* After all, those who produce similar goods could use the same words or symbols "with equal truth"—thus, they should have "an equal right to employ [them], for the same purpose." *Id.*, at 607.

Courts repeated and applied this rule for decades. See, *e. g.*, *Wolfe* v. *Goulard*, 18 How. Pr. 64, 67 (N. Y. Sup. Ct. 1859); *Falkinburg* v. *Lucy*, 35 Cal. 52, 64 (1868); *Filley* v. *Fassett*, 44 Mo. 168, 176–177 (1869); *Congress Spring Co.* v. *High Rock Spring Co.*, 45 N. Y. 291, 295 (1871). For instance, a gin manufacturer could not claim an exclusive right to the term "Schiedam Schnapps" if it already served as a common descriptor of gin. *Wolfe*, 18 How. Pr., at 67. But a stove manufacturer could trademark the term " 'Charter Oak,' " as a distinctive phrase not "merely descriptive of the style, quality, or character" of the product. *Filley*, 44 Mo., at 176–177. Then, as now, courts understood that a mark merits protec-

tion only so far as it "identif[ies] the article to which it is affixed as that of the person adopting it, and distinguish[es] it from others." *Gillott* v. *Esterbrook*, 47 Barb. 455, 462 (N. Y. Sup. Ct. 1867), aff'd, 48 N. Y. 374 (1872); see also *Matal* v. *Tam*, 582 U. S. 218, 223 (2017). This inquiry is inherently content based.

The ratification of the Fourteenth Amendment in 1868, which incorporated the First Amendment against the States, did not prompt courts to change course.[1] They continued to scrutinize proposed marks based on their content. Likewise, this Court's first trademark decision, issued in 1871, invoked *Amoskeag*'s content-based criteria to define those trademarks "entitled to legal protection." *Canal Co.* v. *Clark*, 13 Wall. 311, 323–324 (1872) (concluding that "geographical names," including "'Pennsylvania wheat'" and "'Virginia tobacco,'" could not be protected as trademarks, as they "point only at the place of production, not to the producer"). See *ante*, at 298–299. Thus, at the earliest point at which the First Amendment could have applied to trademark law, content discrimination, particularly with respect to the very definition of a trademark, was the norm.

Trademark registration restrictions followed suit. Federal registration, though not required to enforce a trademark, "confers important legal rights and benefits on trademark owners" and thus "helps to ensure that trademarks are fully protected." *Matal*, 582 U. S., at 225–226 (internal quotation marks omitted). Unsurprisingly, as the Court notes, Congress's first trademark statute included certain content-based restrictions for federal registration. See Act of July 8, 1870, §§ 77, 79, 16 Stat. 210–211; *ante*, at 298. And today, each of the Lanham Act's registration criteria refers to the

---

[1] There would have been no reason for courts to consider the relationship between the First Amendment and trademark law before 1868. Before incorporation, the First Amendment applied only to the Federal Government, and there was no federal trademark law until 1870. *Ante*, at 297–298.

content of the applicant's mark. See 15 U. S. C. §1052. Thus, just as courts have long identified the criteria for trademark protection along content-based lines, Congress has defined the rules for *enhanced* trademark protection along content-based lines.

## B

The upshot is that content discrimination has long been "necessary for [trademark's] purposes and limitations." See *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533, 543 (2001) (considering the "accepted usage" of a "particular medium" to determine the constitutionality of speech restrictions within that medium). The law protects trademarks because they help consumers identify the goods that they intend to purchase and allow producers to "reap the financial rewards associated with the[ir] product's good reputation." *Jack Daniel's Properties, Inc.* v. *VIP Products LLC*, 599 U. S. 140, 146 (2023); see also *Falkinburg*, 35 Cal., at 64. But trademarks can only fulfill these twin goals if they actually serve as source identifiers, see *Jack Daniel's*, 599 U. S., at 146, which, as explained above, is a content-based question, see *supra*, at 314–315.

These content-based trademark rules have long coexisted with the Free Speech Clause, and their function is generally compatible with it. Courts have applied content-based rules not to "suppres[s] . . . ideas," but simply to serve trademark law's purposes. See *Davenport*, 551 U. S., at 189 (internal quotation marks omitted). Indeed, these trademark restrictions can actually help prevent "interfere[nce] with the marketplace of ideas," *id.*, at 188, insofar as they ensure that a single producer cannot exclusively appropriate words or phrases in the general domain, see *Wolfe*, 18 How. Pr., at 67. This is not to say that the Government could not abuse content-based trademark registration restrictions—as I explain below, such restrictions are not insulated from scrutiny. But they do not set off alarm bells signaling the likelihood that "'official suppression of ideas is afoot.'" *Davenport*, 551 U. S., at 189 (quoting *R. A. V.*, 505 U. S., at 390). There-

BARRETT, J., concurring in part

fore, I agree with the Court that we need not treat content-based trademark registration restrictions as presumptively unconstitutional.  *Ante*, at 295.

II

Though content-based registration restrictions do not trigger strict scrutiny, they are still subject to judicial review. Thus, we must decide how to evaluate Elster's challenge to the names clause.

The Solicitor General suggests that we draw an analogy to another area that is inherently content based: the limited public forum.  When the government opens its property to speech for a particular purpose, creating a limited public forum, it necessarily must "reserv[e the property] for certain groups or for the discussion of certain topics."  *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995).  Content-based restrictions are "inherent and inescapable" in maintaining a forum for speech "compatible with the intended purpose of the property."  *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 49 (1983).  It is therefore inappropriate to view these restrictions as presumptively unconstitutional and apply strict scrutiny.  Still, not every restriction is permissible.  To evaluate these rules, we ask "whether they are reasonable in light of the purpose which the forum at issue serves."  *Ibid.*  This ensures that the government "respect[s] the lawful boundaries it has itself set."  *Rosenberger*, 515 U. S., at 829.

Though I would not shoehorn the trademark registration system into the definition of a "limited public forum," the Solicitor General's analogy is apt.[2]  Content discrimination

---

[2] JUSTICE THOMAS mistakenly suggests that I present the federal trademark register as a limited public forum.  *Ante*, at 309.  That is not my position.  Rather, I view the *content-based nature* of the limited public forum as analogous to the trademark registration system.  Moreover, by characterizing my argument as a conclusory statement that the limited public forum framework is "'apt,'" JUSTICE THOMAS ignores my reasons for drawing the analogy.  *Ibid.*

is "[i]mplicit in the concept of" the trademark registration system much like it is in a limited public forum. *Perry*, 460 U. S., at 49. Federal registration "help[s] protect marks" by conferring strong legal rights on markowners who register them. *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, 575 U. S. 138, 142 (2015). Congress provided for "national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers," matching trademark's historical goals. *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*, 469 U. S. 189, 198 (1985); see *supra*, at 314–315. A mark can only fulfill those goals to the extent that it "tells the public who is responsible for [the] product." *Jack Daniel's*, 599 U. S., at 146. This is a content-based requirement.

Content-based criteria for trademark registration do not abridge the right to free speech so long as they reasonably relate to the preservation of the markowner's goodwill and the prevention of consumer confusion. A particular restriction will serve those goals if it helps ensure that registered marks actually function as source identifiers. Notably, "the lead criterion for registration is that the mark 'in fact serve as a "trademark" to identify and distinguish goods.'" *Ibid.* (quoting 3 J. McCarthy, Trademarks and Unfair Competition § 19:10 (5th ed. 2023) (McCarthy)). Other registration criteria help to carry out that threshold requirement. For instance, the Lanham Act prohibits the registration of marks that are "merely descriptive" of the applicant's goods. 15 U. S. C. § 1052(e)(1). As courts frequently explained in the early years of trademark, marks that simply describe the kind and quality of the good do not necessarily identify its source. See *supra*, at 314–315. The bar on registering "deceptive" marks likewise prevents registered marks from misidentifying the source of the goods. § 1052(a).

The names clause passes muster under this test. A trademark that includes another living person's name without her

consent has the obvious potential to create source confusion. Further, the clause helps protect producer goodwill. By freely using another person's name in her mark, the markowner can unfairly capitalize on the reputation of the named individual, who may be a producer in her own right. Conversely, if the markowner's goods or services are shoddy, she might jeopardize the named individual's reputation.

Elster protests that consumers would not assume that Donald Trump is responsible for the mark "'Trump too small.'" Brief for Respondent 35. Thus, he argues that even if the names clause generally guards against source confusion, refusing to register his proposed mark does not. But Congress is entitled to make categorical judgments, particularly where heightened scrutiny does not apply. The Government can reasonably determine that, on the whole, protecting marks that include another living person's name without consent risks undermining the goals of trademark. The names clause is therefore constitutional, both facially and as applied to Elster's mark.

## III

Rather than adopt a generally applicable principle, the Court assesses the names clause in isolation, treating the supposed history and tradition of the clause as determinative. In my view, the historical record does not alone suffice to demonstrate the clause's constitutionality. For one thing, the record does not support the Court's conclusion. For another, I disagree with its choice to treat tradition as dispositive of the First Amendment issue.

### A

First, the Court's history. It is true that "a tradition of restricting the trademarking of names" arose in the late 19th century. *Ante*, at 307. As the Court says, a personal name by itself, without any accompanying words or symbols, did not typically qualify as a trademark. See *McLean* v. *Flem-*

*ing*, 96 U. S. 245, 252–253 (1878); *ante*, at 302. And a person
could not always enforce a trademark including her own
name against another with the same name. See *Brown
Chemical Co.* v. *Meyer*, 139 U. S. 540, 542 (1891); *ante*, at 302–
303.[3] The first federal trademark statute reflected these
principles, prohibiting the registration of a mark that was
"merely the name of a person, firm, or corporation only, unac-
companied by a mark sufficient to distinguish it from the
same name when used by other persons." §79, 16 Stat. 211.
Today, the Lanham Act continues to bar the registration of
a mark that is "primarily merely a surname." 15 U. S. C.
§1052(e)(4).

But the Court also claims that the common law did not
afford protection to a person seeking a trademark including
*another* living person's name (in other words, a rule akin to
the names clause). *Ante*, at 303. I am less sure. In *Thad-
deus Davids Co.* v. *Davids Mfg. Co.*, 233 U. S. 461 (1914),
this Court explained that the 1905 federal trademark statute
contained "a fairly complete list of the marks used by dealers
in selling their goods, which are not valid trademarks at com-
mon law." *Id.*, at 467 (internal quotation marks omitted).
Notably, this statute did not include the names clause or any
rough equivalent.[4] And if such a common-law rule existed,
the majority opinion does not identify it. Instead, the Court
draws from sources suggesting that a person could not en-
force a trademark with another individual's name *against
that individual*. See *ante*, at 303. Nor could she fraudu-

---

[3] By the early-20th century, however, courts enforced personal-name
marks even against "newcomer[s] with the same name when confusion
over source [was] the likely result." 2 McCarthy §13:8; see *L. E. Water-
man Co.* v. *Modern Pen Co.*, 235 U. S. 88, 94 (1914).

[4] The *Thaddeus* Court referred specifically to the statute's prohibition
on the registration of marks that "consis[t] merely of individual, firm or
corporate names, not written or printed in a distinctive manner, or of
designations descriptive of the character or quality of the goods with
which they are used, or of geographical names or terms." 233 U. S., at
467.

lently attempt to pass off her goods as those of another person, using that person's name. *Ibid.* So far, so good. Yet the names clause prevents other uses of someone else's name that the common law may have allowed. And on that score, the Court does not fully grapple with countervailing evidence.

In 1860, the Supreme Court of Rhode Island concluded that the phrase " 'Roger Williams Long Cloth' " was "capable of distinguishing" the manufacturer's goods and thus qualified as a trademark. *Barrows* v. *Knight*, 6 R. I. 434, 438. " 'Roger Williams,' though the name of a famous person," the Court explained, was, "as applied to cotton cloth, a fancy name," as would be the case with "any other her[o], *living* or dead." *Ibid.* (emphasis added). Likewise, a New York court upheld the plaintiffs' exclusive right to use the name "Bismarck" to designate their paper collars, as they were the first to "appropriate" the name for that purpose. *Messerole* v. *Tynberg*, 4 Abb. Pr. (N. S.) 410, 414 (Ct. Com. Pl. 1868). The court thus rejected the defendant's argument that the plaintiffs could not adopt "the name of a distinguished German citizen" as a trademark. *Id.*, at 412. Summarizing, the Second Circuit explained that "[t]he law permits the adoption as a trade-mark of the name of a person who has achieved fame and distinction, provided the name is not descriptive of the quality or the character of the article or a geographical name." *Stephano Bros., Inc.* v. *Stamatopoulos*, 238 F. 89, 93 (1916). See also *Medlar & Holmes Shoe Co.* v. *Delsarte Mfg. Co.*, 46 A. 1089 (N. J. Ch. Ct. 1900) ("The name of a famous person, used merely as a fancy name, may become an exclusive trade-mark"); W. Browne, Law of Trade-Marks § 216, pp. 225–226 (2d ed. 1885) (same).[5]

---

[5] The Court dismisses my examples as irrelevant because several involve the names of dead individuals. *Ante*, at 307, n. 4. But "[t]he exclusive right to grace paper collars with Bismarck's name was granted while he was still alive." J. Pike, Personal Names as Trade Symbols, 3 Mo. L. Rev. 93, 101 (1938) (Pike). And the other authorities either expressly recog-

The legislative history of the Lanham Act also undercuts the Court's conclusion. If the names clause codified an existing common-law tradition, one might expect to see some reference to that tradition when the names clause was adopted. But proponents of the clause offered a different justification. Discussing a predecessor version of the clause, Edward Rogers, the Lanham Act's primary drafter, remarked that "[t]he idea of prostituting great names by sticking them on all kinds of goods is very distasteful to me." Trade-Marks: Hearings on H. R. 9041 before the Subcommittee on Trade-Marks, House Committee on Patents, 75th Cong., 3d Sess., 79 (1938) (H. R. 9041); see J. Litman, Keynote Address, 39 Cardozo Arts & Ent. L. J. 855, 856 (2021). The Commissioner of the Patent Office agreed, noting the "shock to [his] sense of propriety to see liberty taken . . . with the names of celebrities of private life." H. R. 9041, at 79. He then referred to the attempted registration of "the name of the Duchess of Windsor for brassieres and ladies' underwear." *Ibid.* They did not suggest that the common law would already prevent those uses of another's name as a trademark. On the contrary, they seemed most concerned about the types of marks that the common law appeared to allow. See *supra*, at 321.

It is thus difficult to say that the names clause is constitutional solely because of its historical pedigree.[6] Perhaps

_____

nized that the names of famous living persons could be trademarked, see *Barrows*, 6 R. I., at 438, or did not indicate whether the rule differed for dead versus living individuals, see *Stephano Bros.*, 238 F., at 92–93. Indeed, "[t]he authorities [were] somewhat meagre" as to "the rule . . . . where the notable person [was] still alive," Pike 100, undercutting the notion that the common law contained a clear rule one way or the other.

[6] The Court characterizes my critique as a demand for a "historical twin." *Ante*, at 308, n. 4. On the contrary, my point is that the Court has not cleared the "historical analogue" bar it sets for itself. The existence of closely analogous historical counterexamples surely complicates the argument that "history and tradition" alone establish the clause's constitu-

BARRETT, J., concurring in part

recognizing that reality, the Court relies not only on the purported common-law tradition restricting the trademarking of names, but also points to the names clause's relation to trademark's historical purposes. *Ante*, at 305–306. The latter argument is quite similar to my own—I agree that the names clause helps to ensure that the proposed mark functions as a source identifier and to guard against reputational consequences, serving trademark's historical goals.

B

But I cannot agree with the Court that the existence of a "common-law tradition" and a "historical analogue" is sufficient to resolve this case. *Ante*, at 307–308. Even if the Court's evidence were rock solid, I still would not adopt this approach. To be sure, tradition has a legitimate role to play in constitutional adjudication. For instance, the longstanding practice of the political branches can reinforce our understanding of the Constitution's original meaning. *Consumer Financial Protection Bureau* v. *Community Financial Services Assn. of America, Ltd.*, 601 U. S. 416, 442 (2024) (KAGAN, J., concurring). A course of deliberate practice might liquidate ambiguous constitutional provisions. See The Federalist No. 37, p. 229 (C. Rossiter ed. 1961). The views of preceding generations can persuade, and, in the realm of *stare decisis*, even bind. But tradition is not an end in itself—and I fear that the Court uses it that way here.

The Court does not (and could not) argue that the late-19th and early-20th century names-restriction tradition serves as evidence of the original meaning of the Free Speech Clause. Cf. *Samia* v. *United States*, 599 U. S. 635, 655–656 (2023) (BARRETT, J., concurring in part and concurring in judgment). Nor does it treat the history it recites as a persua-

tionality. By presenting its evidence as conclusive, "the Court overclaims." *Samia* v. *United States*, 599 U. S. 635, 657 (2023) (BARRETT, J., concurring in part and concurring in judgment).

sive data point. Instead, it presents tradition itself as the constitutional argument; the late-19th and early-20th century evidence is dispositive of the First Amendment issue. Yet what is the theoretical justification for using tradition that way?

Relying exclusively on history and tradition may seem like a way of avoiding judge-made tests. But a rule rendering tradition dispositive is *itself* a judge-made test. And I do not see a good reason to resolve this case using that approach rather than by adopting a generally applicable principle. (After all, there is a tradition of the latter approach too. See, *e. g.*, *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819) (adopting standard for application of the Necessary and Proper Clause).) In the course of applying broadly worded text like the Free Speech Clause, courts must inevitably articulate principles to resolve individual cases. I do not think we can or should avoid doing so here. As I explained in Part I–B, the takeaway from history is that content-based trademark restrictions have long been central to trademark's purpose of facilitating source identification, and they have not posed a serious risk of censorship. This principle offers a generally applicable way to think about whether registration restrictions "'play well with the First Amendment.'" *Ante*, at 300. We should bring clarity to the law by adopting it.

In my view, the Court's laser-like focus on the history of this single restriction misses the forest for the trees. It gives secondary billing to what I think is the central point: that the names clause "reflects trademark law's historical rationale of identifying the source of goods." *Ante*, at 305. I see no reason to proceed based on pedigree rather than principle. Besides, as the Court admits, its approach merely delays the inevitable: Eventually, the Court will encounter a restriction without a historical analogue and be forced to articulate a test for analyzing it. *Ante*, at 308.

SOTOMAYOR, J., concurring in judgment

\*    \*    \*

Trademark protection cannot exist without content discrimination. So long as content-based registration restrictions reasonably relate to the purposes of the trademark system, they are constitutional. The names clause clears this bar. I respectfully concur in part.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, concurring in the judgment.

This case involves a free-speech challenge to a viewpoint-neutral, content-based condition on trademark registration. In deciding how to evaluate this kind of challenge, the Court faces two options: Either look only to the history and tradition of the condition, or look to trademark law and settled First Amendment precedent. The first option, which asks whether the history of a particular trademark registration bar plays well with the First Amendment, leads this Court into uncharted territory that neither party requests. The other guides it through well-trodden terrain. I would follow the well-trodden path.

In assessing the constitutionality of the names clause and other trademark registration provisions, I would rely on this Court's tried-and-tested First Amendment precedent. This Court has held in a variety of contexts that withholding benefits for content-based, viewpoint-neutral reasons does not violate the Free Speech Clause when the applied criteria are reasonable and the scheme is necessarily content based. That is the situation here. Content discrimination is an inescapable feature of the trademark system, and federal trademark registration only confers additional benefits on trademark holders. The denial of trademark registration is therefore consistent with the First Amendment if it turns on "reasonable, viewpoint-neutral content regulations." *Iancu* v. *Brunetti*, 588 U. S. 388, 424 (2019) (SOTOMAYOR, J., concurring in part and dissenting in part). Because the names

clause satisfies that test, I would uphold the constitutionality of the provision on that ground alone.

## I

## A

This case is the latest in a trilogy of challenges to the constitutionality of trademark registration bars in the Lanham Act.   See *id.*, at 390; *Matal* v. *Tam*, 582 U. S. 218, 223 (2017).   In the first two cases, the Court struck down as unconstitutional certain registration bars that discriminated based on viewpoint.   *Ante*, at 293 (majority opinion) (citing *Brunetti*, 588 U. S., at 390, 393–394; *Tam*, 582 U. S., at 243 (plurality opinion); *id.*, at 248–249 (Kennedy, J., concurring in part and concurring in judgment).   Because those cases involved viewpoint-based provisions, there was no occasion to consider the framework for "how to evaluate viewpoint-neutral restrictions on trademark registration."   *Brunetti*, 588 U. S., at 398, n.   This case, by contrast, presents that very circumstance—a viewpoint-neutral, content-based condition on trademark registration.

The names clause prohibits registration of a mark that "[c]onsists of or comprises a name . . . identifying a particular living individual except by his written consent."   15 U. S. C. § 1052(c).   No one disputes that the names clause is content based.   Its application turns, after all, on the mark's content, *i.e.*, whether it identifies by name a particular living individual without his or her written consent.   See *City of Austin* v. *Reagan Nat. Advertising of Austin, LLC*, 596 U. S. 61, 69 (2022) (explaining that a regulation is content based if its application turns on "'the topic discussed or the idea or message expressed'").   The names clause is also viewpoint neutral because it is agnostic as to how the name in the mark is being used and does not "distinguis[h] between two opposed sets of ideas."   *Brunetti*, 588 U. S., at 394; see *ante*, at 293–294, and n. 2 (majority opinion) (holding that the clause is viewpoint neutral both on its face and in practice).   On these

points, and on the conclusion that the names clause is constitutional, we all agree. Our disagreement boils down primarily to methodology.

B

Those familiar with this trilogy of First Amendment challenges to the Lanham Act may be surprised, perhaps even disappointed, to learn that, although this case presents the "situation we did not address in *Tam* or *Brunetti*," the Court has shied away from setting forth a "framework 'for deciding free speech challenges to provisions of the Lanham Act.'" *Ante*, at 295 (majority opinion) (quoting *Tam*, 582 U. S., at 245, n. 17 (plurality opinion)). Yet perhaps the biggest surprise (and disappointment) of today's five-Justice majority opinion is its reliance on history and tradition as a dispositive test to resolve this case.

In holding that the names clause is constitutional, that majority asserts that one need look only to the "history and tradition" of the clause and "no further." *Ante*, at 301. Why look to history and tradition alone? Because, the majority says, it "is sufficient to conclude that the names clause . . . is compatible with the First Amendment." *Ibid.* Considering this Court has never applied this kind of history-and-tradition test to a free-speech challenge, and that "[n]o one briefed, argued, or even hinted at the rule that the Court announces today," one would have expected a more satisfactory explanation. *Lozman* v. *Riviera Beach*, 585 U. S. 87, 102 (2018) (THOMAS, J., dissenting). There is none grounded in our First Amendment doctrine and precedent.

JUSTICE BARRETT questions the majority's because-it-is-sufficient explanation in part by claiming that, if anything, the Court's evidence "does not establish a historical analogue for the names clause." *Ante*, at 311 (opinion concurring in part). That may well be true. Yet this back-and-forth highlights the indeterminacy of the Court's history-and-tradition inquiry, which one might aptly describe as the equivalent of entering a crowded cocktail party and looking

over everyone's heads to find your friends. Cf. *Conroy* v. *Aniskoff*, 507 U. S. 511, 519 (1993) (Scalia, J., concurring in judgment). To make matters worse, the five-Justice majority that undertakes this tradition-as-dispositive inquiry found its friends in a crowded party to which it was not invited. That majority has drawn conclusive inferences from its historical evidence, all without any guidance from the litigants or the court below. That stark departure from settled principles of party presentation and adversarial testing in favor of in-chambers historical research by nonhistorians raises more questions than answers. Cf. *Maslenjak* v. *United States*, 582 U. S. 335, 354 (2017) (GORSUCH, J., joined by THOMAS, J., concurring in part and concurring in judgment) ("[T]he crucible of adversarial testing on which we usually depend, along with the experience of our thoughtful colleagues on the district and circuit benches, could yield insights (or reveal pitfalls) we cannot muster guided only by our own lights").

It is not appropriate, much less necessary, to find common-law analogues to settle the constitutionality of the names clause or any other trademark registration provision. I agree with JUSTICE BARRETT that, even if the majority's historical "evidence were rock solid," there is no good reason to believe that "hunting for historical forebears on a restriction-by-restriction basis is the right way to analyze the constitutional question." *Ante*, at 311, 323. The majority attempts to reassure litigants and the lower courts that a "history-focused approac[h]" here is sensible and workable, by citing to *New York State Rifle & Pistol Assn., Inc.* v. *Bruen*, 597 U. S. 1 (2022). *Ante*, at 307–308, n. 4. To say that such reassurance is not comforting would be an understatement. One need only read a handful of lower court decisions applying *Bruen* to appreciate the confusion this Court has caused. Cf. Brief for Second Amendment Law Scholars as *Amici Curiae* in *United States* v. *Rahimi*, O. T. 2023, No. 22–915, pp. 4–6 (discussing examples of confusion among lower courts applying *Bruen*).

SOTOMAYOR, J., concurring in judgment

Ultimately, I am reluctant to go further down this precipice of looking for questionable historical analogues to resolve the constitutionality of Congress's legislation. To borrow Justice Scalia's criticism from a different context, such hunting "far into the dimmy past" is not just "a waste of research time and ink" but also "a false and disruptive lesson in the law . . . that . . . condemns litigants (who, unlike us, must pay for it out of their own pockets) to subsidizing historical research by lawyers." *Conroy*, 507 U. S., at 519 (opinion concurring in judgment). I would instead apply this Court's First Amendment precedent, just as the parties did in arguing this case.

C

The most straightforward way to resolve this and other free-speech challenges to trademark registration criteria is through a doctrinal framework drawn from this Court's First Amendment precedent. The analysis should proceed in two steps. First ask whether the challenged provision targets particular views taken by speakers on a given subject. If the trademark registration bar is viewpoint based, it is presumptively unconstitutional and heightened scrutiny applies; if it is viewpoint neutral, however, the trademark registration bar need only be reasonable in light of the purpose of the trademark system. Specifically, the trademark registration bar must reasonably serve its purpose of identifying and distinguishing goods for the public. If the challenged provision is both viewpoint neutral and reasonable, then it does not violate the Free Speech Clause.

II

A

This Court has applied strict constitutional scrutiny to viewpoint-neutral content classifications on some occasions, and thus treated them as "presumptively unconstitutional." *Reed* v. *Town of Gilbert*, 576 U. S. 155, 163 (2015). It has declined to do so, however, when any "risk" that such classi-

fication "will impermissibly interfere with the marketplace of ideas" is "attenuated"; that is, when "'there is no realistic possibility that official suppression of ideas is afoot.'" *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177, 188–189 (2007) (quoting *R. A. V.* v. *St. Paul*, 505 U. S. 377, 390 (1992)). In those cases, "the difference between viewpoint-based and viewpoint-neutral content discrimination can be decisive." *Brunetti*, 588 U. S., at 421 (opinion of S<span style="font-variant:small-caps">OTOMAYOR</span>, J.). This is such a case: Whereas the denial of trademark registration under viewpoint- and content-based criteria is presumptively unconstitutional under heightened scrutiny, a denial under viewpoint-neutral, content-based criteria is not constitutionally suspect and does not trigger the same exacting scrutiny. See *ante*, at 292–300 (majority opinion).

In explaining why the difference is decisive in this context, the Court and J<span style="font-variant:small-caps">USTICE</span> B<span style="font-variant:small-caps">ARRETT</span> emphasize that trademarks are inherently content based, yet have long coexisted with the First Amendment. *Ante*, at 295–300 (majority opinion); *ante*, at 312–317 (opinion of B<span style="font-variant:small-caps">ARRETT</span>, J.). I agree with the use of historical evidence to support this point. History informs the understanding that content-based distinctions are an intrinsic feature of trademarks, and that the marks' purpose is to identify and distinguish goods for the public. See *ante*, at 312–316 (opinion of B<span style="font-variant:small-caps">ARRETT</span>, J.). That use of history is legitimate and in fact valuable, just as evidence of a longstanding practice of government can inform the meaning of constitutional provisions in appropriate cases. See *ante*, at 323–324 (opinion of B<span style="font-variant:small-caps">ARRETT</span>, J.); cf. *Consumer Financial Protection Bureau* v. *Community Financial Services Assn. of America, Ltd.*, 601 U. S. 416, 442 (2024) (K<span style="font-variant:small-caps">AGAN</span>, J., concurring); *The Pocket Veto Case*, 279 U. S. 655, 689 (1929). That is not how the five-Justice majority is using history, however. The majority instead treats a disputed (and isolated) account of the history and tradition of the names clause as determinative of its constitutionality. Cf. *ante*, at 300–308 (applying new history-and-tradition test). It is that "judge-made test"

that is unmoored from constitutional text and precedent, and which I repudiate as unhelpful. *Ante*, at 324 (opinion of BARRETT, J.).

Even then, history does not give us the full story. The assertion that content-based distinctions in trademark law have long played well with the First Amendment, although true, requires a more fulsome explanation, particularly as applied to the trademark registration system. The primary reason why viewpoint-neutral trademark registration criteria easily coexist with the Free Speech Clause is that they do not burden expression. Instead, a denial of registration withholds ancillary benefits that might bolster someone's expression. When a government confers a benefit that supports some forms of expressive activity, the decision to withhold that benefit on viewpoint-neutral grounds "'cannot be equated with the imposition of a "penalty" on that activity,'" which would trigger heightened scrutiny. *Rust* v. *Sullivan*, 500 U. S. 173, 193 (1991) (quoting *Harris* v. *McRae*, 448 U. S. 297, 317, n. 19 (1980)).

1

"The First Amendment protects the freedom of speech; it does not require the Government to give aid and comfort to those using" particular "modes of expression." *Brunetti*, 588 U. S., at 401 (ROBERTS, C. J., concurring in part and dissenting in part). Indeed, this Court has recognized repeatedly that the First Amendment permits governmental bodies to rely on reasonable, viewpoint-neutral, content-based criteria when deciding to benefit certain communicative activities. See, *e. g.*, *National Endowment for Arts* v. *Finley*, 524 U. S. 569, 587–588 (1998) ("[T]he Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake").

As I explained in *Brunetti*, and the Solicitor General argues in this case, various strands of precedent support this point, ranging from cases about limited public (or nonpublic)

forums to those involving monetary subsidies and noncash governmental programs (such as the collection of fees by public-sector labor unions). See 588 U. S., at 422–424 (collecting cases); Brief for Petitioner 16–21 (same).[1] In these cases, content discrimination was necessarily a part of the governmental initiative at issue, yet the initiative was not subject to the constitutional straitjacket of heightened scrutiny. See, *e. g.*, *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 49 (1983) (noting that content discrimination is "[i]mplicit in the concept of the nonpublic forum," yet declining to apply heightened scrutiny). That was so because each "initiative . . . supported some forms of expression without restricting others. Some speakers were better off, but no speakers were worse off." *Brunetti*, 588 U. S., at 423 (opinion of SOTOMAYOR, J.).

These cases "may not be controlling [here] in a strict sense, yet they do provide some instruction." *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533, 544 (2001). They generally stand for the proposition that the Free Speech Clause permits governmental bodies to impose a "reasonable, viewpoint-neutral limitation" on a "state-bestowed entitlement." *Davenport*, 551 U. S., at 189; see, *e. g.*, *Christian Legal Soc. Chapter of Univ. of Cal.*, *Hastings College of Law* v. *Martinez*, 561 U. S. 661, 669 (2010) (upholding "reasonable, viewpoint-neutral condition" on access to government initiative); *Ysursa* v. *Pocatello Ed. Assn.*, 555 U. S. 353, 355 (2009) (same); *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 808 (1985) (same);

---

[1] According to JUSTICE THOMAS (who is joined by two Justices), I focus primarily on cash-subsidy and union-dues cases. A closer look at this opinion and the cases that I cite will reveal that is not exactly true. As I mentioned in *Brunetti*, and both the Government and JUSTICE BARRETT assert in this case, limited public (or nonpublic) forum cases also constitute helpful analogies for arriving at the generally applicable principles that should apply to this kind of case. See Brief for Petitioner 18–19; accord, *ante*, at 317–319, and n. 2 (opinion of BARRETT, J.).

SOTOMAYOR, J., concurring in judgment

*Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 550 (1983) (same).[2]

2

Someone with a federally registered mark enjoys certain benefits by virtue of that registration. Even so, free speech is not abridged when these benefits are denied to someone based on reasonable, viewpoint-neutral criteria.

Consider three basic tenets of trademark law, each of which the Court rightly acknowledges. See *ante,* at 290–291. First, "every trademark's 'primary' function" is to tell the public who is responsible for a particular product, that is, to serve as a source identifier. *Jack Daniel's Properties, Inc.* v. *VIP Products LLC*, 599 U. S. 140, 146 (2023). Although trademarks may also communicate a "message," that message is only incidental to "what a trademark is and does." *Id.*, at 145–146. Second, "federal law does not create trademarks." *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, 575 U. S. 138, 142 (2015). Rather, by virtue of common law, the first person to use a "distinct mark in commerce . . . acquires rights to that mark," including exclusivity rights to "preven[t] others from using the mark." *Ibid.* Third, federal registration provides increased trademark protection

---

[2] JUSTICE THOMAS responds that these precedents are an "ill fit" for the names clause because this case does not involve "cash subsid[ies]," "union dues," or a "limited public forum." *Ante,* at 309. That response misses the entire point. In the past, this Court has relied on limited-public-forum cases as instructive, even if not controlling, when resolving constitutional challenges to governmental subsidies (and vice versa). See, *e. g.*, *Legal Services Corporation*, 531 U. S., at 544. The Court relied on these decisions for their underlying legal principle only. That is, after all, how law works. That the trademark registration system does not involve cash subsidies, union dues, or a limited public forum is immaterial for purposes of the analysis in this opinion. As just discussed, the legal principle in each of these cases is that the Constitution permits reasonable, viewpoint-neutral limitations on speech where, as here, the Government only benefits certain forms of expression through initiatives that are intrinsically content based without restricting other expression.

only by conferring additional benefits on trademark holders. See *ibid.* For example, it (1) provides "nationwide constructive notice of the registrant's claim of ownership of the mark," which forecloses some defenses in infringement actions; and (2) constitutes "prima facie evidence" of the mark's validity and exclusivity in commerce. *Ante,* at 291 (citing 15 U. S. C. §§ 1072, 1115(a)). To be sure, nothing in the Constitution requires these predominantly commercial benefits.

One conclusion follows from these three principles: By prohibiting trademark registration for viewpoint-neutral, content-based reasons, Congress simply denies an applicant the opportunity to include his mark on a list and secure "certain benefits" that are "useful in infringement litigation." *Jack Daniel's,* 599 U. S., at 146. The risk of speech suppression is therefore "attenuated" because denying a trademark holder these ancillary benefits does not prevent him from using his mark in commerce or communicating any message incidental to the mark. *Davenport,* 551 U. S., at 188; see *Brunetti,* 588 U. S., at 421–422 (opinion of SOTOMAYOR, J.); *id.,* at 401 (opinion of ROBERTS, C. J.) ("Whether . . . marks can be registered does not affect the extent to which their owners may use them in commerce to identify goods. No speech is being restricted; no one is being punished. The owners of such marks are merely denied certain additional benefits associated with federal trademark registration").

B

Now consider the facts of this case. Respondent Steve Elster wants to sell shirts with the phrase TRUMP TOO SMALL on them. He also wants increased trademark protection by federally registering the phrase. In the registration request, Elster explained that the phrase "invokes a memorable exchange between President Trump and Senator Marco Rubio from a 2016 presidential primary debate, and aims to 'convey[ ] that some features of President Trump and his policies are diminutive.'" *In re Elster,* 26 F. 4th 1328, 1330 (CA Fed. 2022) (alteration in original).

When the U. S. Patent and Trademark Office rejected the registration request, it denied Elster the opportunity to secure the Government-bestowed benefits associated with registration. Critically, the denial did not prevent Elster from communicating his message. It also did not restrict his preferred mode of expression. Elster can still sell shirts displaying the same message. Elster could also use a different phrase (such as ELSTER APPAREL) as a source identifier to obtain the desired benefits of registration while continuing to sell shirts with his preferred message across the front. See Tr. of Oral Arg. 23–24 (discussing "Elster Apparel" example). Put simply, the denial only barred Elster from registering a mark asserting exclusive rights in another person's name without their written consent.

## III

### A

Because trademark registration criteria limit statutory benefits in a necessarily content-based scheme, the First Amendment requires the criteria to be viewpoint neutral and reasonable. *Supra*, at 329, 331–332; *Brunetti*, 588 U. S., at 424 (opinion of SOTOMAYOR, J.). From this Court's analogous nonpublic-forum and limited-public-forum cases, it is clear that "reasonable" means that the challenged provision must reasonably serve the purpose of the content-based scheme. On this point, I agree with JUSTICE BARRETT that the challenged trademark registration criteria must be "reasonable in light of the trademark system's purpose of facilitating source identification." *Ante*, at 312; see *ante*, at 317–319.

In *Cornelius*, for example, the Court confronted a free-speech challenge to the Government's decision to exclude "legal defense and political advocacy organizations from participation in the Combined Federal Campaign (CFC or Campaign), a charity drive aimed at federal employees." 473 U. S., at 790. After concluding that the CFC was a nonpublic forum "not dedicated to general debate or the free exchange of ideas," the Court held that the First Amendment

permits content- and speaker-based "distinctions" so long as they are "reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.*, at 806, 811. Importantly, the "decision to restrict access . . . need not be the most reasonable or the only reasonable limitation." *Id.*, at 808–809. Based on this test, the Court ultimately concluded that the Government acted reasonably, and consistent with the Free Speech Clause, in "limit[ing] participation in the CFC in order to minimize disruption to the federal workplace, to ensure the success of the fundraising effort, or to avoid the appearance of political favoritism without regard to the viewpoint of the excluded groups." *Id.*, at 813.

Justice Thomas (joined by two Justices) rejects this test, implying that it is subjective because it supposedly turns on what a given judge might think is reasonable. *Ante*, at 308. That statement misunderstands the inquiry. As just discussed, a trademark registration condition is reasonable if it serves as a source identifier, a concept that is familiar to anyone who has worked on a trademark case. See *Jack Daniel's*, 599 U. S., at 146; 1 J. McCarthy, Trademarks and Unfair Competition § 3:1 (5th ed. 2023). More generally, this kind of reasonableness inquiry appears in every limited public (or nonpublic) forum case. Far from being subjective and unworkable, this kind of test goes to the very core of what judges and lawyers do every day. When contrasted to their preferred history-driven approach, the criticism of the reasonableness inquiry is even more unpersuasive. As discussed above, the history-and-tradition approach is not just flawed as a matter of first principles, but also highly indeterminate and unfamiliar to judges and litigants in this area of the law. See *supra*, at 327–329. How much history is enough to clear the historical analogue bar the five-Justice majority set up? What does that look like in this context? When it comes to subjectivity, their preferred approach empowers judges to pick their friends in a crowded party. See *supra*, at 327–328. When faced with the two options, I choose the test

SOTOMAYOR, J., concurring in judgment

that is rooted in this Court's First Amendment doctrine and precedent, is attuned to what judges and lawyers are properly trained to do, and does not limit Congress from dealing with modern-day conditions based on the foresight of yesterday's generation.

B

"Content-based criteria for trademark registration do not abridge the right to free speech so long as they reasonably relate to the preservation of the markowner's goodwill and the prevention of consumer confusion," "goals" that a "particular restriction will serve . . . if it helps ensure that registered marks actually function as source identifiers." *Ante*, at 318 (opinion of BARRETT, J.) The names clause easily passes this reasonableness test. Source identification is, after all, at the heart of what the names clause does.

Imagine someone who wants to manufacture and sell the best bats and catchers' mitts in baseball. Unsurprisingly, that person wants to use the names of Derek Jeter and Jorge Posada to capitalize on their goodwill to promote the products. So, the manufacturer lands on JETER OUT OF THE PARK and CATCH LIKE POSADA as marks. The names clause bars registration of these phrases without the named individuals' written consent. It does so for good reason: Jeter and Posada may not want consumers to misattribute these products to them, just as consumers may not want to buy products under the false pretense that these goods somehow are connected to the players.[3] Source identifica-

---

[3] Other Lanham Act provisions prohibit the registration of marks that deceive or falsely suggest a connection to a person or entity. See 15 U. S. C. § 1052(a). That there is some overlap between the false-suggestion and names clauses does not change the fact that the names clause reasonably serves the purpose of source identification. When heightened scrutiny is not in play, Congress is free to use belts and suspenders to support an asserted interest. I therefore also agree with JUSTICE BARRETT that "Congress is entitled to make [the] categorical judgmen[t] . . . that, on the whole, protecting marks that include another living

tion is especially important when, for example, the named individual produces similar products—say, Jeter and Posada sell their own baseball goods under the marks MR. NOVEMBER BATS BY JETER and CHAMP'S MITTS BY POSADA. They would not want manufacturers to dilute the commercial value of their name and reputation. Nor would Jeter and Posada want a Boston Red Sox fan to manufacture cheaper goods and use their names to promote second-rate products. The names clause prevents that from happening.

Congress was entitled to make this legislative judgment. The Government, after all, "has a reasonable interest in refraining from lending its ancillary support to marks" that use an unconsenting individual's name for commercial gain. *Brunetti*, 588 U. S., at 425 (opinion of SOTOMAYOR, J.); cf. *id.*, at 401 (opinion of ROBERTS, C. J.) ("The Government, meanwhile, has an interest in not associating itself with trademarks whose content is obscene, vulgar, or profane"). In sum, the names clause is constitutional because it is a viewpoint-neutral, reasonable limitation on a trademark's registration.

\*    \*    \*

The Court's "decision today is narrow," and its history-and-tradition test is good only for "the relatively simple case before us today." *Ante*, at 308, 310. Ultimately, all nine Justices agree that Congress can innovate when it comes to trademark law, and we further agree that nothing in today's opinion calls into question the constitutionality of viewpoint-neutral provisions lacking a historical pedigree. See *ibid.*; *ante*, at 311 (KAVANAUGH, J., concurring in part); *ante*, at 311–312 (opinion of BARRETT, J.); *supra*, at 327–329.

For the reasons set forth above, I respectfully concur in the judgment.

---

person's name without consent risks undermining the goals of trademark." *Ante*, at 319.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 286, line 9: "the" is replaced with "a"
p. 289, lines 12–13: "analog" is replaced with "analogue"
p. 303, line 20: "own" is inserted after "his"
p. 304, line 8 from bottom: "Trade" is replaced with "Trading"